## In re KOREAN AIR LINES DISASTER OF SEPTEMBER 1, 1983.

MDL No. 565.
Misc. No. 83–0345.

United States District Court,
District of Columbia.

July 1, 1994.

Milton G. Sincoff, and Steven R. Pounian, of Kreindler & Kreindler, New York City and Donald W. Madole, and George E. Farrell, of Speiser, Krause, Madole & Lear, Rosslyn, VA, for plaintiff.

George N. Tompkins, Jr., of Condon & Forsyth, New York City and Thomas J. Whalen, and Timothy J. Lynes, of Condon & Forsyth, Washington, DC, for defendant.

### MEMORANDUM OPINION AND ORDER

AUBREY E. ROBINSON, Jr., District Judge.

This matter is before the Court on the Motion of Defendant Korean Air Lines Co., Ltd. ("KAL") to Vacate and Set Aside the Final Judgment on the Issue of Liability and Grant a New Trial pursuant to Fed.R.Civ.P. 60(b), Plaintiffs' Memorandum in Opposition to KAL's Motion, KAL's Reply Statement and Plaintiff's Sur–Reply. Also before the Court is KAL's Motion to Strike Plaintiffs' Sur–Reply and Plaintiffs' Opposition to that Motion.

### I. Background

This litigation began more than a decade ago, after Korean Air Lines Flight 007, en route from New York to Seoul, South Korea, strayed off course into Soviet airspace. Flight 007 was shot down on September 1, 1983 over the Sea of Japan by Soviet military aircraft, and all 269 persons aboard the aircraft were killed. Numerous wrongful death actions, brought under the Warsaw Conven-

tion[1] and the Death on the High Seas Act,[2] were filed in various courts in the United States.

In 1983, the Judicial Panel on Multidistrict Litigation ("Panel") ordered that 42 federal actions arising from the crash be transferred to the U.S. District Court for the District of Columbia and assigned to this Court for coordinated or consolidated pretrial proceedings. *In Re Korean Air Lines Disaster of Sept. 1, 1983*, 575 F.Supp. 342 (J.P.M.L.1983). As the litigation developed, a total of approximately 190 cases arising from the downing of Flight 007 were consolidated before this Court for pretrial purposes and for a jury trial on the common issue of liability.

On August 2, 1989, the jury returned a verdict that the destruction of Flight 007 and the resulting deaths were proximately caused by the "wilful misconduct"[3] of the crew of Flight 007. The jury assessed punitive damages against KAL in the amount of $50 million. On appeal, the U.S. Court of Appeals for the D.C.Circuit affirmed the finding of wilful misconduct, but vacated the jury's punitive damages award. *In Re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475 (D.C.Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991). After disposition of the appeal, the Panel ordered that all of the cases transferred to this Court be remanded to the original transferor courts for individual trials on the issue of damages ("damages cases").[4]

In December, 1993, KAL filed in this Court a Motion to Vacate and Set Aside the Final Judgment on the Issue of Liability and Grant a New Trial Pursuant to Fed.R.Civ.P. 60(b). Given that KAL's Motion to Vacate challenges the validity of the underlying verdict of liability common to all of the litigation that has resulted from the destruction of Flight 007, the Panel transferred or retransferred approximately 46 cases back to this Court pending a decision on KAL's Motion.[5]

KAL's Motion to Vacate is based in large part on the "Report of the Completion of the ICAO Fact–Finding Investigation," issued in June, 1993, by the International Civil Aviation Organization ("ICAO"). In October, 1992, the Russian Federation released various information and documents concerning the destruction of Flight 007. Shortly thereafter in January, 1993, the cockpit voice recorder and the digital flight recorder of Flight 007 were, for the first time, turned over to ICAO by the Russian Federation, along with recordings and transcripts of communications between the Soviet aircraft pilots who shot down Flight 007 and their ground controllers. These critical pieces of information, which had not previously been available to ICAO, were analyzed in order to produce the Report issued by ICAO in 1993 ("1993 ICAO Report").

## II. Summary of the Issues

Seeking relief from the 1989 liability verdict under Fed.R.Civ.P. 60(b)(6), KAL argues that it is entitled to a new trial because of the extraordinary circumstances surrounding the release and analysis of the digital flight data

1. Convention for the Unification of Certain Rules Relating to International Transportation by Air, October 12, 1929, entered into force for the United States on October 29, 1934, 49 Stat. 3000; T.S. No. 876, *reprinted in* 49 U.S.C.App. § 1502 (1988).

2. 46 U.S.C.App. § 761 (1988).

3. Article 25 of the Warsaw Convention states that:

   The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.

4. Absent a finding of wilful misconduct, the Warsaw Convention limits damages to $75,000 per passenger. *See* Order of Civil Aeronautics Board Approving Increases in Liability Limitations of Warsaw Convention and Hague Protocol, *following* 49 U.S.C.App. § 1502. Since the jury found KAL guilty of wilful misconduct in connection with the downing of Flight 007, individual damages trials are necessary to determine the amount of damages in excess of $75,000 to which the decedents' family members are entitled.

5. *See In Re Korean Air Lines Disaster of Sept. 1, 1983*, Order of Transfer or Retransfer, Docket No. 565, 1994 WL 143009 (J.P.M.L. Apr. 12, 1994). At the time KAL filed its Motion to Vacate, there were approximately 50 cases on behalf of passengers killed on Flight 007 to be tried or on trial in five federal district courts, and about 15 damages cases already on appeal or in which appeals were anticipated in four circuit courts.

recorder and the cockpit voice recorder, which led to the issuance of the 1993 ICAO Report. Alternatively, KAL contends that, even if Rule 60(b)(6) does not apply to the circumstances at bar, the Court should treat KAL's Motion as an independent action for relief and grant KAL's Motion on equitable grounds.

Plaintiffs challenge KAL's claim that Rule 60(b)(6) governs the Motion. Instead, Plaintiffs contend that Rule 60(b)(2) applies to KAL's Motion, and that, under Rule 60(b)(2), the Motion should be denied because it was not filed in accordance with the Rule's time limitations. Plaintiffs further maintain that KAL's Motion is without merit because the 1993 ICAO Report supports the verdict rendered by the jury in the 1989 liability trial.

## III. Analysis

### A. *Rule 60(b): Its Scope and the Court's Discretion*

Rule 60(b) permits a court to grant relief from a final judgment under certain circumstances and within specified time periods. Specifically, Rule 60(b) provides, in relevant part, that:

> On motion and upon such terms as are just, the court may relieve a party ... from a final judgment ... for the following reasons: ... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); ... or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment ... was entered or taken.

Fed.R.Civ.P. 60(b).

■ In addition, Rule 60(b) authorizes the court to entertain an independent action in equity in order to relieve a party from a final judgment. The rule was designed to preserve "the delicate balance between the sanctity of final judgments, expressed in the doctrine of res judicata, and the incessant command of the court's conscience that justice be done in light of *all* the facts." *Bankers Mortgage Co. v. United States*, 423 F.2d 73,

77 (5th Cir.), *cert. denied*, 399 U.S. 927, 90 S.Ct. 2242, 26 L.Ed.2d 793 (1970); *accord Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572, 577 (D.C.Cir.1980).

A district court has broad discretion to grant or deny a motion filed under Rule 60(b). *Randall v. Merrill Lynch*, 820 F.2d 1317, 1320 (D.C.Cir.1987), *cert. denied*, 484 U.S. 1027, 108 S.Ct. 753, 98 L.Ed.2d 765 (1988); *Reinsurance Comp. of America, Inc. v. Administratia Asigurarilor de Stat*, 902 F.2d 1275, 1277 (7th Cir.1990). An appellate court may reverse a trial court's grant or denial of relief under Rule 60(b) only for abuse of discretion, which is established when no reasonable person could agree with the district court's ruling. *Randall*, 820 F.2d at 1320; *Reinsurance*, 902 F.2d at 1277.

### B. *Exclusivity of Clauses in Rule 60(b)*

■ A motion for relief from judgment based on newly discovered evidence under Rule 60(b) must be made within a year of the entry of judgment. Fed.R.Civ.P. 60(b)(2). In contrast, a motion for relief brought under Rule 60(b)(6) need only be made within a reasonable time after the entry of judgment. In order to prevent circumvention of the one-year time limitation applicable to motions for relief from judgment made under clauses (1), (2), and (3), of Rule 60(b), courts have interpreted the clauses of Rule 60(b) to be mutually exclusive. *See Klapprott v. United States*, 335 U.S. 601, 613, 69 S.Ct. 384, 389–90, 93 L.Ed. 266 (1949); *Goland v. CIA*, 607 F.2d 339, 372–73 (D.C.Cir.1978) *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *Carr v. District of Columbia*, 543 F.2d 917, 926 n. 72 (D.C.Cir.1976). Therefore, where a motion for relief from judgment is deemed to be one under clauses (1) through (5) of Rule 60(b), and that motion is denied, the only other avenue for relief available to the movant comes not under Rule 60(b)(6), but rather in the form of an independent equitable action as provided for in Rule 60.

### C. *The Evidence Underlying KAL's Motion*

■ Given that KAL is not entitled to relief under Rule 60(b)(6) if Rule 60(b)(2)

applies, the Court must first determine whether the digital flight data recorder and the cockpit voice recorder, which form the basis for the analysis and conclusions found in the 1993 ICAO Report, are newly discovered evidence.

Courts have held that, in order for evidence to be newly discovered under Rule 60(b)(2), the following criteria must be met: (1) the evidence must have been in existence at the time of trial; (2) the evidence must be such that it was not and could not by the exercise of due diligence have been discovered in time to present it in the original proceeding; (3) the evidence must not be merely cumulative or impeaching; and (4) the evidence must be admissible and credible, and of such a material and controlling nature as will probably change the outcome. *See Goland*, 607 F.2d at 371 n. 12; *Johnson Waste Materials v. Marshall*, 611 F.2d 593, 597 (5th Cir.1980); *American Cetacean Soc'y v. Smart*, 673 F.Supp. 1102, 1106 (D.D.C.1987). The newly discovered evidence rule has also been found to be applicable to evidence that "pertain[s] to facts in existence at the time of trial." *National Anti–Hunger Coalition v. Executive Comm. of the President's Private Sector Survey on Cost Control*, 711 F.2d 1071, 1075 n. 3 (D.C.Cir.1983); *accord Contempo Metal Furniture Co. v. East Texas Motor Freight Lines, Inc.*, 661 F.2d 761, 766 (9th Cir.1981).

KAL argues that the circumstances surrounding the release of the digital flight data recorder and the cockpit voice recorder, and the subsequent issuance of the 1993 ICAO Report, should be viewed as something more than newly discovered evidence, thereby triggering Rule 60(b)(6) rather than Rule 60(b)(2). It is undisputed, however, that although they were not available to be presented at the trial because of the actions of the Soviet Union, the digital flight data recorder and the cockpit voice recorder, and the information derived from them, existed at the time of liability trial. Moreover, the digital flight data recorder and the cockpit voice recorder were not merely cumulative and impeaching, and would have been admissible, credible, and of a material and controlling nature had they been available to the parties

at the time of trial. Therefore, the Court concludes that the digital flight data recorder and the cockpit voice recorder are newly discovered evidence, subject to the strict one-year time limitation found in Rule 60(b)(2). Since KAL, although through no fault of its own, failed to bring its Motion within one year of the entry of judgment, it is not entitled to relief under Rule 60(b)(2).

D. *The Equitable Nature of Rule 60(b)(6)*

*Assuming arguendo* that KAL is correct in its assertion that the digital flight data recorder and the cockpit voice recorder are "something more" than newly discovered evidence, thus invoking Rule 60(b)(6) rather than Rule 60(b)(2), the Court accepts KAL's contention that its Motion was made within a reasonable time from the issuance of the 1993 ICAO Report. It is the Court's view, however, that Rule 60(b)(6) does nothing to advance KAL's cause.

The Supreme Court wrote in *Klapprott*: "The language of the 'other reason' clause, for all reasons except the five particularly specified, vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." 335 U.S. at 614–15, 69 S.Ct. at 390. For example, courts have granted relief under Rule 60(b)(6) where the parties have demonstrated the existence of extraordinary circumstances or where there is evidence of extreme hardship or injustice. *Id.* at 615, 69 S.Ct. at 390–91 (relief from default judgment granted to petitioner who "was deprived of any reasonable opportunity to make a defense" to sedition charges); *Goland*, 607 F.2d at 373 (a showing of changed circumstances might entitle movant to relief under Rule 60(b)(6) if the situation is extraordinary and not covered by clauses (1) through (3)); *United States v. Cirami*, 563 F.2d 26, 33–35 (2d Cir.1977) (relief granted to defendants whose lawyer, while suffering from a mental disorder, failed to oppose motion for summary judgment, even though he had assured defendants of his attendance to their case); *Bros. Inc. v. W.E. Grace Mfg. Co.*, 320 F.2d 594, 609 (5th Cir.1963) (relief under Rule 60(b)(6) was appropriate where the circumstances suggested "something more" than a

request for relief based on newly discovered evidence or on grounds of fraud).

Rule 60(b)(6) is essentially an equitable catch-all provision that provides relief when the specific grounds for relief set forth in clauses (1) through (5) of the Rule are inapplicable. Courts, have stated that Rule 60(b), which authorizes a district judge to act upon a showing of "any other reason justifying relief from the operation of judgment," represents a "grand reservoir of equitable power ... which, in a proper case, is to be liberally applied." *Cirami*, 563 F.2d at 32; *accord Dunlop v. Pan American World Airways, Inc.*, 672 F.2d 1044, 1051 (2d Cir.1982). Equitable relief, however, is "limited to circumstances 'which render it manifestly unconscionable that a judgment be given effect.'" *Greater Boston Television Corp. v. FCC*, 463 F.2d 268, 279 (D.C.Cir.1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972); *accord Carr*, 543 F.2d at 926.

■ The same substantive standards that govern a motion for relief under Rule 60(b) apply to an independent action in equity. *Carr*, 543 F.2d at 927; *Philippine Nat'l Bank v. Kennedy*, 295 F.2d 544, 545 (D.C.Cir.1961).[6] Therefore, a party seeking equitable relief under Rule 60(b) must establish that: the evidence was not and could not by due diligence have been discovered in time to produce it at trial; the evidence is not merely cumulative; and the evidence would probably lead to judgment in the movant's favor. *Id.* A party bringing an independent action based on newly discovered evidence bears a "heavy burden" to demonstrate that these criteria have been met. *Johnson*, 611 F.2d at 597–98.

As previously discussed in this Opinion, the digital flight data recorder and the cockpit voice recorder obviously could not have been produced at the 1989 liability trial because they were concealed by the Soviet Union. Had these two pieces of information been available, they certainly would have been analyzed by ICAO in its investigation and discussed in its initial Report. However, it is the view of this Court, as explained more fully below, that the information about the downing of Flight 007 which the digital flight data recorder and the cockpit voice recorder provide would probably not lead to judgment in KAL's favor, and therefore KAL is not entitled to relief from the verdict rendered by the jury at the liability trial.

E. *The Evidence of Wilful Misconduct Introduced at the Liability Trial and the 1993 ICAO Report As It Relates to the Issue of Wilful Misconduct*

■ The first leg of Flight 007, from New York to Anchorage, Alaska, was routine, but during the second leg of the trip, from Anchorage to Seoul, Flight 007 strayed from its assigned course of Route R20. Route R20 has a series of navigational waypoints, designated as BETHEL, NABIE, NUKKS, NEEVA, NINNO, NIPPI, NYTIM, NOKKA and NOHO, which are used by flight crews to verify their course and to report their position. The 1983 ICAO Report concluded that, shortly after Flight 007 departed from Anchorage, it gradually deviated from Route R20 to the north. The flight continued for some five hours and twenty-six minutes, during which time its course deviation grew progressively worse, until it was shot down in Soviet airspace. 1983 ICAO Report at 1.

The 1983 ICAO Report, which was admitted into evidence at the liability trial, offered two possible explanations for Flight 007's course deviation: a misprogramming of the plane's inertial navigation system (INS) prior to its departure from Anchorage, or the use of a constant magnetic heading.[7] With re-

---

6. It should also be noted, that in *Philippine Nat'l Bank*, the appellate court, in affirming the district court's denial of the 60(b) motion, wrote: "Here the judge who tried the case, and who was fully familiar with the evidence formerly offered, decided that plaintiff-appellant was not entitled to relief." 295 F.2d at 545.

7. The inertial navigation system (INS) is a navigational device that stores preprogrammed flight plans and displays data during the flight which shows present position, waypoint positions, and any course deviations from the designated route. The INS must be programmed before takeoff by inserting the exact latitudinal and longitudinal coordinates at the gate where the aircraft is parked prior to takeoff.

spect to these two theories, the Report stated: "Each of those postulations assumed a considerable degree of lack of alertness and attentiveness on the part of the entire flight crew but not to a degree that was unknown in international civil aviation." 1983 ICAO Report at 56.

During the liability trial, Plaintiffs, relying on U.S., Russian and Japanese radar reports, as well as on the 1983 ICAO Report, argued that Flight 007 flew off its assigned course of Route R20 for virtually the entire flight. The testimony of Plaintiffs' experts at trial was that the crew of Flight 007 committed wilful misconduct by flying off course for more than five hours, three hours of which were in Soviet airspace well-known as extremely dangerous because of the risk of shootdown. Plaintiffs' experts further opined that, regardless of the cause of the course deviation, the nature and extent of the deviation suggested that either the crew flew through Soviet airspace intentionally or that they repeatedly ignored fundamental and mandated navigational safety procedures which, if followed, would have alerted the crew to Flight 007's course deviation. See Affidavit of Frank L. Houston, Jan. 19, 1994, attached to Plaintiff's Memorandum in Opposition to KAL's Motion to Set Aside the Liability Judgment.

ICAO, in its 1993 Report, corroborates one of the theories offered by Plaintiffs during the liability trial and reaches several conclusions about what happened to Flight 007. By analyzing the digital flight data recorder, ICAO determined that Flight 007's course deviation resulted from the maintenance of a constant magnetic heading. The constant magnetic heading, given its accuracy, occurred because Flight 007 was being controlled by autopilot. The use of the constant magnetic heading and the ensuing course deviation was due to the failure of Flight 007's crew to recognize that the autopilot had either been left in heading mode or had been switched to INS after the plane was outside of the range for the INS to capture the desired course. In addition, the ICAO Re-

A constant magnetic heading would have resulted if Flight 007 was being controlled by auto-

port concluded that there were no malfunctions of Flight 007's INS, or of any of the aircraft's systems. 1993 ICAO Report at 59.

The 1993 ICAO Report also confirms that Flight 007's course deviation began just 10 minutes into the flight from Anchorage to Seoul. Flight 007 was approximately 12 nautical miles north of BETHEL, its first waypoint station, and all other waypoint stations were missed by increasing margins of error as the plane continued to veer north, further off Route R20 for more than five hours, until it was shot down approximately 360 miles from Route R20. Id. at 4–5. Finally, the 1993 ICAO Report contains an illustration of the probable flight path of Flight 007, based on the digital flight data recorder, that is virtually identical to the flight path Plaintiffs presented during the liability trial. Compare 1993 ICAO Report at 12 with Plaintiffs' Liability Trial Exh. 407A, attached as Exh. 1 to Plaintiff's Memorandum in Opposition to KAL's Motion to Set Aside the Liability Judgment.

It is this Court's view that the 1993 ICAO Report confirms the testimony and demonstrative evidence offered during the liability trial that the crew of Flight 007 committed wilful misconduct when it flew off course for more than five hours and failed to follow mandated navigational procedures. In its 1993 ICAO Report, ICAO discusses the three operational manuals which detailed procedures concerning the use of inertial navigation. The Report states:

Particularly relevant were the procedures for checking navigation system accuracy at the commencement of oceanic navigation. These procedures required careful overflight of the last available external navigational aid, in this case Bethel VORTAC, and specific checks of INS accuracy. The procedures also provided for an outbound track check when the oceanic fix was a VOR. These procedures, included in the KAL Operations Manual, were not observed since KE 007 did not pass over Bethel VORTAC.

pilot, rather than by the flight crew.

1993 ICAO Report at 43. The Report continues, stating that:

> Any error in one of the three INS would have been apparent from comparison with the other two systems. The accuracy of the INS was better than 2 NM per hour of flight. The lateral displacement of 12 NM from Bethel VORTAC after 49 minutes of flight should have alerted the flight crew to a possible problem and prompted an immediate assessment of the situation. The guidance material on INS navigation in the North Pacific and North Atlantic oceanic areas emphasized that ATC be informed in any case of doubt as to the accuracy of the INS.

*Id.* Also, the deviation of Flight 007 was such that ground-based navigational aids during the first half of Route R20 that would have provided the crew of Flight 007 with a means to cross-check its location had the flight been on course were unavailable, yet the crew failed to report that it had not seen any of those aids. *Id.* at 45. Moreover, the INS displays, if properly monitored and interpreted, would have provided numerous indications to the crew that they had not in fact passed over the designated waypoints and were therefore off course. *Id.* at 56–57.

To summarize, the 1993 ICAO Report provides several significant conclusions regarding the downing of Flight 007:

> The maintenance of a constant magnetic heading and the resulting track deviation was due to the crew's failure to note that the autopilot had either been left in heading mode or had been switched to INS when the aircraft was beyond the range (7.5 NM) for the INS to capture the desired track. . . .
>
> The maintenance of a constant magnetic heading was not due to any aircraft system malfunction. . . .
>
> The flight crew did not implement the proper navigation procedures to ensure the aircraft remained on its assigned track throughout the flight. . . .
>
> The failure to detect the aircraft's deviation from its assigned track for over five hours indicated a lack of situational awareness and flight deck co-ordination on the part of the crew.

*Id.* at 59. Given these conclusions, and the undisputed fact that the crew of Flight 007 flew the plane off course further and further north from the early minutes of the flight for more than five hours until it was shot down, having full knowledge of the dangers of flying through Soviet airspace, this Court concludes that the 1993 ICAO Report supports the jury's verdict that KAL was guilty of wilful misconduct in connection with the destruction of Flight 007. Since the information derived from the digital flight data recorder and the cockpit voice recorder confirms much of what Plaintiffs presented to the jury during the liability trial, KAL fails to satisfy the third criteria for equitable relief from a judgment, namely that the evidence would probably lead to judgment in the movant's favor.

KAL makes much of other conclusions found in the 1993 ICAO Report: that there were no indications that Flight 007's crew deliberately maintained a constant magnetic heading; that there was a normal, relaxed atmosphere on the flight deck; and that the crew was not aware of Soviet interceptor aircraft either before or after the shootdown. *Id.* at 60–61. KAL takes the position that, since the flight crew did not intend nor did they know of Flight 007's course deviation, the crew's actions do not amount to wilful misconduct.

This Court's charge to the jury regarding the definition of wilful misconduct, although challenged by KAL during its appeal of the liability verdict, was upheld by the Court of Appeals. *See In Re Korean Air Lines Disaster,* 932 F.2d at 1479–81. The Court's instruction stated that:

> Wilful misconduct is the intentional performance of an act with knowledge that the act will probably result in an injury or damage, or in some manner as to imply reckless disregard of the consequences of its performance. And likewise, it also means an intentional failure to act with knowledge that such failure to act will probably result in injury or damage, or in some manner as to imply reckless disregard of the consequences of the failure to act. It also means a deliberate purpose

not to discharge some duty necessary to safety with knowledge that the failure to discharge the duty necessary to safety will probably result in injury or damage or with reckless disregard of the consequences of not discharging the duty necessary to safety.

*In Re Korean Air Lines Disaster of Sept. 1, 1983,* MDL No. 565/Misc. No. 83–0345, Transcript of Trial, Vol. 12 at 1610–11 (Aug. 1, 1989). With respect to safety regulations, the Court instructed the jury that:

The intentional violation of safety rules and regulations applicable to air transport, with knowledge that the violation was likely to cause injury to passengers, may constitute wilful misconduct within the meaning of Article 25 of the Warsaw Convention. An intentional violation of the safety rules and regulations done in such a manner as to imply reckless disregard of the consequences of the violation, may also constitute wilful misconduct ... Each member of the flight crew had a continuing duty throughout the entire flight to be alert, correctly use their navigation and other equipment, and to keep the plane on course.

*Id.* at 1611–12.

Regardless of ICAO's conclusion in its 1993 Report that there were no indications that the crew of Flight 007 deliberately maintained a constant magnetic heading, the fact remains that there is no question that the crew failed to follow safety regulations and procedures, and that they failed to utilize any one of several navigational instruments and geographic aids available to them from virtually the beginning of the flight. At its very first waypoint, BETHEL, which was critical to ensure that the flight was correctly aligned for Route R20, the flight was already 12 miles off course. Had the crew followed proper navigational procedures, they could have detected their course deviation early in the flight and taken appropriate corrective action. Instead, the crew continued to proceed further north of its course for more than five hours, until Flight 007 was ultimately shot down in Soviet airspace, about 360 miles off its assigned route. Given the crew's knowledge of the grave danger of being fired upon in Soviet airspace, and the length and severity of the flight's deviation from its course, the crew's failure to follow mandated navigational procedures and its "lack of situational awareness," in this Court's view, amounts to wilful misconduct. Therefore, the evidence from the digital flight data recorder and the cockpit voice reporter, and the conclusions derived from them found in the 1993 ICAO Report, support the jury's finding that the destruction of Flight 007, resulting in the loss of 269 lives, was proximately caused by KAL's wilful misconduct.

Accordingly, it is by the Court this 1st day of July, 1994,

**ORDERED,** that KAL's Motion to Vacate and Set Aside the Final Judgment on the Issue of Liability and Grant a New Trial pursuant to Fed.R.Civ.P. 60(b) be and hereby is **DENIED;** and it is

**FURTHER ORDERED,** that KAL's Motion to Strike Plaintiffs' Sur–Reply be and hereby is **DENIED.**